## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **LATIKA GIRI**, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>**THE NATIONAL BOARD OF MEDICAL EXAMINERS**,<br><br>Defendant. | Case No. 24-cv-410 (CRC) |

## <u>MEMORANDUM OPINION</u>

This is the Court's second occasion to consider Dr. Latika Giri's allegations that the National Board of Medical Examiners ("NBME" or "the Board") unlawfully discriminated against test-takers of Nepali ethnicity and national origin by invalidating their medical licensing examination results. Giri previously filed an emergency motion for a preliminary injunction to reinstate her scores. In its last opinion, the Court concluded that such extraordinary relief was not warranted because the record demonstrated that NBME took action against Giri and other Nepali examinees due to evidence of widespread cheating, not discriminatory animus.

Following the Court's ruling, Giri and an additional plaintiff, Dr. Sweccha Shrestha, filed an amended complaint. NBME has moved to dismiss. Unfortunately for Plaintiffs, this second bite at the apple is no more successful than the first. Giri and Shrestha waived their claims against NBME by signing release forms prior to filing their amended complaint, so the Court must dismiss the case for lack of subject matter jurisdiction. And even if Plaintiffs had not surrendered their claims, the Court still would dismiss the amended complaint because it fails to state valid discrimination claims.

## I.    Background

The Court described much of the legal and factual background of this case in its prior

opinion, so it provides only a summary of the relevant details here.    Giri v. Nat'l Bd. of Med.

Exam'rs (Giri I), 718 F. Supp. 3d 30 (D.D.C. 2024).    The Court takes the following facts from

Plaintiffs' amended complaint as true.    See Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d

1249, 1253–54 (D.C. Cir. 2005).[1]

### A.    The USMLE and the Match Program

The United States Medical Licensing Exam ("USMLE") is a standardized test

administered by NBME and the Federation of State Medical Boards every year to aspiring

doctors who wish to practice medicine in the United States.    Giri I, 718 F. Supp. 3d at 34.    It

consists of three steps:  Step One is a written exam that measures students' grasp of various

scientific concepts and their application to the practice of medicine.    Am. Compl. ¶ 10.    Step

Two is another written exam assessing test-takers' ability to apply "medical knowledge, skills,

and understanding of clinical science to the provision of patient care under supervision."    Id.

¶ 11.  And Step Three, which includes a written exam and clinical simulation, measures whether

examinees "have the knowledge and skills of physicians assuming independent responsibility for

patient care."  Id. ¶ 12.  Graduates of both U.S. and foreign medical schools may sit for the

USMLE.

Once graduates of foreign medical schools have completed the USMLE, they are

certified by the Educational Commission for Foreign Medical Graduates ("ECFMG") as eligible

to apply for residency programs through the National Resident Matching Program ("Match

program").  Id. ¶ 15.  All applicants must pass the first two steps to participate in the Match

---

[1] Some facts are also drawn from the exhibits to NBME's motion to dismiss.

program.  Id. ¶ 14.  Step Three is optional, but most residency programs require completion of that step as well.  Id.

The Match cycle begins in September, when applicants may register for the program.  Id. ¶ 16.  Then, each February, medical school graduates rank their preferred residency programs in order, and residency programs likewise rank applicants.  Id.  Once the rankings are complete, the Match program uses an algorithm to place applicants with residency programs.  Id.; Giri I, 718 F. Supp. 3d at 34.  The results are unveiled on Match Day in mid-March.  Am. Compl. ¶ 16.  Graduates' USMLE scores are an important consideration in residency programs' matching decisions.  Id. ¶ 17.

The USMLE is administered multiple times during the year, and some questions are recycled from one test administration to the next.  Id. ¶ 18.  That repetition entails some risk that examinees may memorize or copy exam questions and disseminate them to future test-takers—a risk NBME has foreseen.  Id. ¶ 19–20.  When validity of any particular exam result is called into question, NBME delays release of the score if it has not yet been released and delays further distribution of the score if it has.  Id. ¶ 20.  NBME then provides test-takers with an opportunity to respond to the suspicion that their scores are invalid.  Id.  The score is cancelled only if the examinee fails to timely respond to this inquiry or provides an inadequate explanation.  Id.

B.  Investigation into Exams Associated with Nepal

By early 2023, the Board had received several anonymous tips claiming that groups of examinees from India, Nepal, Pakistan, and Jordan had distributed prior exam questions in advance of testing.  Id. ¶ 21.  Tipsters alleged that applicants were relying on question banks containing live USMLE material to attain high scores.  Id. ¶ 22.  One tip stated that in India and Nepal, test-takers were "purchasing last six months question papers."  Id. ¶ 22; id., Ex. A ("First

Ward Decl.") ¶ 6.  Another indicated that some test-takers were sharing exam information at study centers located in Kathmandu and in an online group on the "Telegram" app.  Am. Compl. ¶ 24.  The Board also discovered posts on social media and online chat rooms "suggesting that groups of individuals in Nepal were collecting and sharing large amounts of secure exam material in private groups."  First Ward Decl. ¶ 7.

In response to the Telegram tip, NBME dispatched an undercover investigator to infiltrate the Telegram group, in which past exam questions ("PQs") were reportedly being shared.  Am. Compl. ¶ 25; First Ward Decl. ¶ 9.  To join the group, the investigator was required to furnish a USMLE testing permit and documents showing some nexus to Nepal.  First Ward Decl. ¶ 10.

Accessing the Telegram group confirmed the reports:  Individuals were sharing "re-calls" from examinees of prior USMLE questions that were still in active use.  Id. ¶ 12.  Participants boasted that many of the questions they encountered on their Step One exams were "PQs" shared within the group.  Id. ¶ 13.  One poster encountered "around 75% pqs," with most of their friends recognizing "around 90-95%" of questions.  Id.  Other posters echoed the sentiment, touting PQs as their "saviour."  Id. (capitalization omitted).

Members of the Telegram group also worried aloud about raising suspicions of cheating. One expressed unease about the rate at which test-takers were racing through their exams and answering questions they had already encountered.  Id. ¶ 14.  "No one is with that type of super power to finish that exam this much early," the poster observed.  Id.  Another warned participants of the "consequences of talking about pq" when leaving the test center.  Id.

In early 2023, the program responded to the anonymous tips and other information by asking NBME's Psychometrics and Data Analysis ("PADA") department to "analyze examinee

4

performance data for test centers in Jordan, Nepal, and Pakistan." Am. Compl., Ex. B ("Jurich Decl.") ¶ 6. The results from Nepal were the most extreme. Id. ¶ 7. The country's sole test center produced the highest average scores *in the world* on the 2021 and 2022 Step One and 2022 Step Two exams. Id. Compounding NBME's suspicions, examinees who tested at the Nepal center in 2022 were among the fastest 5% for the Step One exam and fastest 10% for Step Two, out of all test-takers worldwide. Id. The number of examinees at the Nepal test center had also more than doubled in the span of three years. Id.

Around April 2023, PADA ran an "agreement analysis" focused on test centers in Jordan, Nepal, Pakistan, and India designed to identify sets of exams that contained a "statistically improbable number of the same *incorrect* response options to the same questions," which could be indicative of prior, shared access to secure exam materials. Jurich Decl. ¶¶ 8, 9; Am. Compl. ¶ 28. The results—which focused on Step One and Step Two exam data from 2021 and 2022— showed that "the vast majority of examinees with a statistically significant number of matching incorrect answers tested at the Nepal test center." Jurich Decl. ¶ 9. A re-run of that analysis in July 2023 focused on "examinees who tested at the Nepal test center and/or were citizens of Nepal[.]" Id. ¶ 11. The new analysis yielded similar results, as did an inquiry into Step Three exams completed by individuals who attended medical school in Nepal or self-reported as a citizen of Nepal. Id. ¶¶ 12–13.

PADA later developed criteria for identifying passing exam results of dubious validity, including incorrect-response correlation, median response times, and substantial differences in performance on different steps of the exam, among other factors. Id. ¶¶ 15, 17. After applying this analysis to test-score data from the Nepal test center, self-reported citizens of Nepal, and graduates of Nepali medical schools, NBME identified 832 examinees (or roughly forty percent

of the sample group) from 2021 through 2023 with at least one dubious exam result. Id. ¶¶ 18–19. Departing from its usual procedures, the Board immediately invalidated the suspect scores and instructed the affected examinees to destroy their ECFMG certificates. Am. Compl. ¶ 46, 48; id., Ex. C ("Mechaber Decl.") ¶ 20.

C. Dr. Giri's Case

Dr. Giri is a citizen and current resident of Nepal who graduated from the Kathmandu University School of Medical Sciences in 2022. Am Compl. ¶ 3. NBME invalidated her Step One, Two, and Three scores because all three exams displayed "[e]xtremely improbable answer similarity with other examinees testing on the same form at similar times[,]" and "[a]bnormal question response times[.]" Jurich Decl., Attach. C ("Email to Giri"). In a January 31, 2024 email notifying Giri that her scores had been invalidated, NMBE indicated that the likelihood of observing Giri's data results "during normal testing conditions" was roughly 1 in 100 million. Id.

The Board offered Giri three alternative forms of recourse: she could retake each step of the examination, request reconsideration of NBME's decision to invalidate her score, or take no action, in which case she would be suspended from retaking the USMLE for three years. Email to Giri. She was required to report her choice within fifteen calendar days. Id. at 2.

That same day, the Board released a statement on the USMLE website explaining that that it had invalidated certain examinees' test scores, stating, in part:

> The USMLE program regularly monitors and analyzes examinees' test performances for unusual score patterns or variations, and other information that could raise questions about the validity of an examinee's results. As part of an ongoing investigation, the USMLE program has identified a pattern of anomalous exam performance associated with Nepal, which challenges the validity of test results for a group of examinees. Highly irregular patterns can be indicative of prior unauthorized access to secure exam content.

6

> Examinees with results in question are being notified by the USMLE
> Secretariat's Office that their previous Step scores have been
> invalidated and that they will be required to take a validation
> exam(s). The USMLE program is working to notify examinees who
> need to schedule validation exam(s) and to support score users and
> other stakeholders impacted by the validation exam requirements.

Mechaber Decl., Attach. C ("USLME Program Statement").

Giri filed a putative class action on February 12, 2024 on behalf of the 832 Nepal-associated examinees whose USMLE scores were invalidated, alleging that NBME had discriminated against her and other putative class members on the basis of their Nepali national origin and ethnicity, in violation of Title VII and 42 U.S.C. § 1981. See Am. Compl. ¶¶ 57, 60, 73–81. She simultaneously filed an emergency Motion for a Preliminary Injunction ordering NBME to reinstate class members' test scores in time for the February 28 rank-order list deadline. See Mot. Prelim. Inj. NBME extended the deadline for putative class members to elect which of the three options they intended to pursue until the Court ruled on the preliminary-injunction motion. See Joint Stipulation, ECF No. 9, ¶ 1; Order Adopting Stipulation, ECF No. 10, ¶ 1.

Eleven days later, following expedited briefing and a hearing, the Court denied Giri's motion for a preliminary injunction, concluding that she was unlikely to succeed on her claims because the record "demonstrate[d] that NBME took action against the putative class because of credible reports of cheating, not discriminatory animus against Nepalis." Giri I, 718 F. Supp. 3d at 33. The same day, Giri responded to NBME's letter. Mot. to Dismiss, Attach. 1 ("Second Ward Decl.") ¶ 11; id., Ex. C ("Giri Response Form") at 1. She selected the second option provided by NBME, requesting reconsideration of the USMLE program's decision to invalidate her scores. Second Ward Decl. ¶ 13.

In submitting her response form, Giri agreed to the following waiver:

> I acknowledge that the USMLE program is giving me the opportunity to request reconsideration of the decision to invalidate one or more of my passing level Step exam outcomes, to appeal any adverse decision that is made if I seek such reconsideration, and to retake the applicable Step exam(s) at no cost if I elect to do so and am otherwise eligible. In exchange, I release the USMLE program and its owners from all claims that I might have that relate in any way to the invalidation of my Step exam outcome(s).

Giri Response Form at 1; see Am. Compl. ¶ 49.

### D. Dr. Shrestha's Case

After the Court denied Giri's preliminary-injunction motion, she filed an amended complaint in April 2024. The amended complaint adds Plaintiff Dr. Swechha Shrestha, a medical resident of Nepali citizenship and ancestry who lives in Nevada. Am. Compl. ¶ 4. In January 2024, NMBE notified Shrestha by email that it had invalidated her Step Three exam score due to concerns about its validity. Second Ward Decl. ¶ 14; id., Ex. D ("Email to Shrestha"). Shrestha, like Giri, elected to request reconsideration of the program's decision to invalidate her score. Second Ward Decl. ¶ 18. In doing so, she likewise agreed to the waiver quoted above. Id. ¶ 17; Ex. E ("Shrestha Response Form") at 1. While the record is short on details, the amended complaint identifies Dr. Shrestha as a "medical resident." Am. Compl. ¶ 4. Presumably, then, she previously participated in the Match and was placed in a residency program that did not require a passing score on Step Three of the USMLE. In any case, the amended complaint explains that while she was "not required to leave the country" following the invalidation of her score, she "must retake Step 3 of the exam in order to continue her residency program[.]" Id. ¶ 55. In the meantime, she "maintains a demanding schedule." Id.

## II.    Legal Standards

NBME moves to dismiss Plaintiffs' complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

When the Court's subject-matter jurisdiction is challenged under Rule 12(b)(1), "the plaintiff[] bear[s] the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction[.]" Biton v. Palestinian Interim Self–Gov't Auth., 310 F. Supp. 2d 172, 176 (D.D.C. 2004). The court construes the allegations contained in the complaint in the plaintiff's favor. M.J. v. D.C., 401 F. Supp. 3d 1, 7 (D.D.C. 2019). When assessing subject-matter jurisdiction, unlike a motion to dismiss for failure to state a claim, a court may consider material outside of the complaint, Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992), but factual discrepancies are resolved in favor of the plaintiff, Crane v. N.Y. Zoological Soc'y, 894 F.2d 454, 456 (D.C. Cir. 1990).

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A court "must treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up). Although a complaint need not provide "detailed factual allegations" to withstand a 12(b)(6) motion, it must offer "more than labels and conclusions." Twombly, 550 U.S. at 555.

### III. Analysis

Giri and Shrestha signed release forms waiving the claims that are the subject of this suit.

Accordingly, the Court will dismiss their claims for lack of subject-matter jurisdiction.  Even if

the Court were to reach the merits of their claims, Plaintiffs fail to state discrimination claims

under Title VII or 42 U.S.C. § 1981.  The Court would therefore dismiss their claims under Rule

12(b)(6) in any case.

#### A.  Prior Release of Claims

NBME contends that Giri's and Shrestha's claims are barred by the release forms they

signed when requesting reconsideration of NBME's decision to invalidate their scores.  As an

initial matter, the Court notes some disagreement among courts in this Circuit about whether

such waivers are appropriately resolved under Rule 12(b)(1) or 12(b)(6).  Compare Blount v.

Johnson, No. 15-769 (RMC), 2016 WL 5313558, at *6–8 (D.D.C. Sept. 22, 2016) (dismissing

claims barred by plaintiff's settlement agreement under Rule 12(b)(6)), aff'd sub nom. Blount v.

Duke, No. 16-5354, 2017 WL 4217463, at *1 (D.C. Cir. Aug. 23, 2017), with Devorah v. Royal

Bank of Canada, 115 F. Supp. 3d 35, 38–39 (D.D.C. 2015) (Cooper, J.) (dismissing claims

barred by plaintiff's settlement agreement under Rule 12(b)(1)).  NBME does not take a position

in its motion on whether Rule 12(b)(1) or 12(b)(6) is the appropriate vehicle for dismissal,

relying in the alternative on both rules.  See Mot. to Dismiss at 13.

The Court concludes, as it has before, that dismissing waived claims implicates its

subject matter jurisdiction and is appropriately accomplished under Rule 12(b)(1).  The Court

confronted this question in Devorah v. Royal Bank of Canada, where the plaintiff had executed

an agreement releasing the Royal Bank of Canada and its affiliates from claims related to the

handling of her investment accounts.  115 F. Supp. 3d at 37.  Although the defendants had

"styled their motion to dismiss as one for failure to state a claim," the Court explained that a release contained in "a valid settlement agreement in fact removes the Court's jurisdiction to hear a plaintiff's complaint." Id. at 38 n.1 (citing Allen v. Nicholson, 573 F. Supp. 2d 35, 38 (D.D.C. 2008)).

Several other cases from this district hold the same. See, e.g., Lindell v. Landis Corp. 401(k) Plan, 640 F. Supp. 2d 11, 14–15 (D.D.C. 2009); Stanley v. George Washington Univ., 394 F. Supp. 3d 97, 106 (D.D.C. 2019), aff'd, 801 F. App'x 792 (D.C. Cir. 2020); Jacobs v. Not-For-Profit Hosp. Corp., 285 F. Supp. 3d 316, 318 (D.D.C. 2018).[2]  Those cases reflect the understanding that "[f]ederal courts lack jurisdiction over a matter that has been settled because, after settlement, the matter does not present an actual controversy suitable for judicial resolution." Jacobs, 285 F. Supp. 3d at 318.  Thus, claims barred by a valid waiver are moot and "[t]he Court lacks subject matter jurisdiction over [those] released claims." Stanley, 394 F. Supp. 3d at 106.

To be sure, Plaintiffs have not executed a settlement agreement with NBME.  But the effect of the release they signed is the same.  So long as the release covers Plaintiffs' claims and is not invalid, it "effectively settle[s] the controversy" and renders Plaintiffs' claims moot. See Allen, 573 F. Supp. 2d at 38.  And under Rule 12(b)(1), the Court may consider material outside

---

[2] The Court acknowledges that the unpublished D.C. Circuit opinion affirming Stanley states, without further reasoning, that "Stanley's claims are therefore properly dismissed under Federal Rule of Civil Procedure Rule 12(b)(6)." Stanley, 801 F. App'x at 793.  But the opinion does not mention the district court's reliance on Rule 12(b)(1), much less grapple with the distinction between the two rules, and therefore does not displace the cited district court cases indicating that Rule 12(b)(1) is the appropriate vehicle for dismissal here.

of the complaint, including the Second Ward Declaration offered by NBME and the release

forms agreed to by Giri and Shrestha. See Herbert, 974 F.2d at 197.[3]

Plaintiffs' claims against NBME fall within the scope of the waivers they signed. Each

agreed to "release the USMLE program and its owners from all claims that I might have that

relate in any way to the invalidation of my Step exam outcome(s)." Giri Response Form at 1;

Shrestha Response Form at 1. Plaintiffs do not contend otherwise. See Opp'n at 32 ("Plaintiffs

acknowledge that the release, if enforceable, would bar their claims here."). Instead, they argue

only that their releases are not enforceable because they resulted from "economic duress." Id.

Unfortunately for Plaintiffs, the amended complaint comes nowhere close to plausibly alleging

economic duress.

First, as NBME correctly notes, even a plausible assertion of economic duress "merely

renders a contract voidable—as opposed to void[.]" Schmidt v. Shah, 696 F. Supp. 2d 44, 64

(D.D.C. 2010); Wright v. Foreign Serv. Grievance Bd., 503 F. Supp. 2d 163, 175 (D.D.C. 2007),

aff'd, No. 07-5328, 2008 WL 4068606 (D.C. Cir. Mar. 17, 2008).[4] Thus, "a plaintiff who

accepts the benefits of the contract entered into under economic duress cannot later seek to have

the contract rescinded." Wright, 503 F. Supp. 2d at 175. Here, Giri and Shrestha have accepted

the benefits of signing their respective release forms. Both requested reconsideration of

---

[3] Even if this motion is properly brought under Rule 12(b)(6), the Court nonetheless could likely consider the waivers Plaintiffs executed because they are referenced in the amended complaint. Am Compl. ¶ 49; see Langeman v. Garland, 88 F.4th 289, 292 (D.C. Cir. 2023) (noting that under Rule 12(b)(6), a court may consider documents "attached to a motion to dismiss if they are 'referred to in the complaint,' integral to the claim(s), and if their authenticity is undisputed").

[4] The parties agree that the Court need not resolve whether the law of the District of Columbia or Pennsylvania (where NBME is headquartered) applies to Plaintiffs' economic duress argument, because both jurisdictions adhere to the Restatement Second on this issue. See Opp'n at 32 n.2; Reply at 2 n.2.

NBME's decision to invalidate her score.  Giri Response Form at 3; Shrestha Response Form at 3.  And both presumably plan to retake the USMLE.  See Am Compl. ¶ 55; Opp'n at 31.  Given that Plaintiffs have "sought to keep the benefits of" the releases they signed, they cannot challenge those releases to litigate their waived claims.  Shah, 696 F. Supp. 2d at 64.

In any event, Plaintiffs have not plausibly alleged that economic duress drove them to sign their releases.  The two elements of economic duress are "(1) an improper threat and (2) the lack of a reasonable alternative."  Osborne v. Howard Univ. Physicians, Inc., 904 A.2d 335, 339 (D.C. 2006).  Plaintiffs have alleged neither element.  They contend that NBME acted improperly when it "threatened to forbid Plaintiffs from sitting for NBME's exam, which would do nothing to further NBME's business," unless they signed the release forms.  Opp'n at 33.  But the Court sees nothing improper in NBME's decision to respond to highly credible evidence of cheating by suspending access to the exam for the examinees in question unless they cooperated with NBME's process.

Plaintiffs also argue that NBME acted improperly by requesting waivers only from the subset of test-takers whose scores were invalidated, a group that NBME allegedly discriminatorily identified.  Opp'n at 34.  But the improper-threat analysis focuses on "any intentional pressure or threats applied by the contracting party to enter into the agreement," not on the party's underlying claims.  See Jung v. Ass'n of Am. Med. Colls., 300 F. Supp. 2d 119, 151 (D.D.C. 2004).  Here, then, the question is whether Plaintiffs were improperly pressured into signing the waivers—a separate inquiry from whether their scores should have been invalidated in the first place.  Plaintiffs offer no facts suggesting such improper pressure.

Second, Plaintiffs fail to allege that they had no reasonable alternative to signing the waivers.  To the contrary, Giri had already begun this litigation and both Plaintiffs could have

continued to seek redress through legal means, rather than requesting that NBME reconsider their score invalidations.  "[A] legal remedy may represent a reasonable alternative to signing a contract" unless the plaintiff alleges "facts establishing specific financial harm that make litigation an unreasonable alternative."  Osborne, 904 A.2d at 340–41; see La France v. Georgetown Univ. Hosp., No. 87-3400 (RCL), 1988 WL 135066, at *3 (D.D.C. Dec. 9, 1988) (noting that a permanent employee has a reasonable alternative to agreeing to an employer's severance terms because he "can always sue for breach of the employment contract").  Plaintiffs allege no facts that suggest they could not have pursued their aims by continuing their already-started litigation.  That is particularly so given that, as Plaintiffs acknowledge, they were able to practice medicine outside the United States, see Opp'n at 34, and that even taking no action in response to NBME's letter would have resulted in only a three-year suspension from the USMLE, not a permanent bar.  Email to Giri; Email to Shrestha.

Plaintiffs liken the waiver to improper threats of termination by an employer, but the cases they cite are distinguishable.  See, e.g., Laemmar v. J. Walter Thompson Co., 435 F.2d 680, 682 (7th Cir. 1970).  As the Court will next discuss, NBME is not Plaintiffs' employer. Moreover, Giri, at least, had not yet secured a residency position or salary at the time that her score was invalidated.  Additional delay in the process of obtaining licenses thus imposed less economic pressure on her than losing one's current job, especially since, as just noted, Giri was free to practice medicine outside the United States.  As for Shrestha, Plaintiffs acknowledge that she was "not required to leave the country" following the invalidation of her score, so she could

14

have sought the redress through litigation discussed above with minimal disruption.  Am. Compl. ¶ 55.[5]

The Court therefore concludes that Plaintiffs have not plausibly alleged economic duress. Compounding the Court's holding are the following observations: Plaintiffs are sophisticated professionals; at least one Plaintiff was represented by counsel at the time she signed the release; and NBME provided Plaintiffs with a reasonable amount of time to consider whether to sign the release forms—indeed, NBME extended that deadline until after the Court ruled on Giri's preliminary-injunction motion.  See Joint Stipulation ¶ 1.  Because the waivers are enforceable, the Court will dismiss Plaintiffs' claims for lack of subject matter jurisdiction.

B.  Merits

Even if Plaintiffs' claims were not barred by the waivers they signed, the Court would dismiss all claims on the merits.  Plaintiffs have not stated Title VII claims because NBME is not their employer.  And Plaintiffs have not stated Section 1981 claims because they have not plausibly alleged discrimination on the basis of ethnicity, as distinct from national origin.

1.  *Title VII Claims*

Plaintiffs' Title VII claims fail because NBME does not qualify as an employer for purposes of the statute.  Plaintiffs acknowledge that they are not employed by NBME but argue that it is nonetheless subject to Title VII liability under the interference theory set forth in Sibley

---

[5] The Court also observes that Shrestha, a current medical resident, must have matched with a program that does not require a passing score on Step Three of the USMLE.  See Am. Compl. ¶ 4.  Shrestha now alleges that she "must retake Step 3 of the exam in order to continue her residency program," id. ¶ 55, but the Court wonders how this can be so.  Plaintiffs allege that Step Three is optional for some residency programs, but they do not allege that Step Three can become mandatory after a resident has already matched without it.  See id. ¶ 14.  To the extent Shrestha in fact wishes to take Step Three so she may transfer to a different residency program, as the Court suspects, that further weakens any claim of economic duress.

Memorial Hospital v. Wilson, 488 F.2d 1338 (D.C. Cir. 1973).  See Opp'n at 14–16.  There, the

D.C. Circuit held that in some circumstances, Title VII covers entities "who are neither actual

nor potential direct employers of particular complainants, but who control access to such

employment and who deny such access by reference to invidious criteria."  Sibley, 488 F.2d at

1342.

Plaintiffs' claims do not resemble those found to be cognizable in Sibley.  That case

concerned a "registry and referral system" through which private nurses were matched with

patients at a hospital.  Id. at 1339.  Though the hospital did not employ the nurses, "the

relationship of the hospital to the employment by its patients of private duty nurses secured for

them by the hospital was very close."  George v. N.J. Bd. of Veterinary Med. Exam'rs., 794 F.2d

113, 114 (3d Cir. 1986).  The D.C. Circuit thus concluded that the hospital could be held liable

under Title VII for the allegedly discriminatory practices it used to match nurses with patients.

Sibley, 488 F.2d at 1342.  In contrast, here, as in other cases concerning the relationship between

licensees and their professional boards, "there [is] nothing even remotely resembling an

employer-employee relationship between the Board and the plaintiff[s]."  George, 794 F.2d at

114.

Indeed, the weight of authority falls against Plaintiffs on this issue.  Although licensing

boards can enjoy "complete control over access [to] the regulated professional job market,"

"such boards have been routinely held *not* to be employers."  Johnson v. Greater Se. Cmty.

Hosp. Corp., 903 F. Supp. 140, 156 (D.D.C. 1995) (emphasis in original) (collecting cases),

order vacated in part, No. 90-1992 (RCL), 1996 WL 377147 (D.D.C. June 24, 1996).  NBME

does not issue medical licenses.  Instead, "[m]edical licensing authorities across the country rely

upon the USMLE to help evaluate the qualifications of individuals seeking an initial license to

practice medicine and to determine their eligibility for medical licensure."  Mechaber Decl. ¶ 5.

NBME is thus even further removed from decisions relating to a medical resident's ultimate

employment than licensing boards, and even less appropriately subject to Title VII liability.  See

Mot. to Dismiss at 22–23.  Reflecting that understanding, in a case very similar to this one, the

Central District of California rejected Title VII claims against NBME, reasoning that "NBME

only administers the licensing exam and reports the scores to residency programs, which does

not constitute 'procuring employees.'"  Kiprilov v. Nat'l Bd. of Med. Exam'rs., No. 160952,

2016 WL 6900723, at *10 (C.D. Cal. Aug. 25, 2016).  The court went on to emphasize that

NBME "does not have the authority to 'control the means and manner' of [plaintiff's]

performance as a physician, nor does it exercise 'substantial control' over the terms or conditions

of her employment."  Id.  Plaintiffs object that Kiprilov does not directly engage with Sibley's

interference theory, but the reasoning in Kiprilov is nevertheless illustrative: it reveals a much

more tangential connection between NBME and an applicant's ultimate employer than the close

nexus between the hospital and private nurse registry in Sibley.  Employing the same logic,

courts have held that Title VII does not apply to bar examination boards or to the American

Board of Internal Medicine.  See Woodard v. Virginia Bd. of Bar Exam'rs, 598 F.2d 1345, 1346

(4th Cir. 1979), Munsif v. Am. Bd. of Internal Med., No. 11-5949, 2012 WL 3962671, at *14

(E.D. Pa. Sept. 11, 2012)).

And contrary to Plaintiffs' contention, this Court's ruling in Taylor v. Pompeo, No. 19-

2987 (CRC), 2021 WL 7904001 (D.D.C. Jan. 6, 2021), does not dictate otherwise.  In that case,

an Assistant United States Attorney secured a detail at the U.S. Embassy in Afghanistan, but his

posting was rescinded after the government declined to issue him a medical clearance.  Id. at *1.

Although Taylor was employed by the Department of Justice, the Court permitted his suit to

proceed against the Department of State, Department of Defense, and Air Force because those entities allegedly "controlled the medical clearance process." Id. at *4. Taylor had already secured a specific employment position and one hiring requirement—that could have been performed by the employer itself—had been delegated to three outside entities. Thus, DOS, DOD, and the Air Force essentially acted in the role of Taylor's employer with respect to the medical-clearance process. Here, passing the USMLE represents only the first step in the involved Match process described above, which may or may not lead to placement in a residency program. Satisfactory performance on the exam permits an applicant to enter the Match program, but it does not guarantee her any particular job or any job at all. The relationship between NBME and a residency applicant is thus far afield from that between an employer and employee. See George, 794 F.2d at 114.

Plaintiffs also rely on Ass'n of Mexican-American Educators v. State of California, 231 F.3d 572, 580–82 (9th Cir. 2000), which held that Title VII applied to a California state agency administering a teacher certification test even though the teachers were employed by individual school districts. Opp'n at 15–16. In reaching that conclusion, however, the Ninth Circuit explicitly distinguished precedent holding that licensing boards are not subject to Title VII based on California's "high level of involvement in the operation of local public schools." Id. at 582. That case therefore turned on the particularities of the state's control over its public-school system and has little to say about cases like this one where "licensing [is] the entire connection between the plaintiffs and the defendants." Id.

Because NBME does not employ Plaintiffs or qualify for the Sibley exception, the Court would dismiss their Title VII claims even if it were to reach the merits.

2.  *Section 1981 Claims*

Plaintiffs' Section 1981 claims fare no better.  The outcome of those claims is controlled by <u>Giri I</u>.  Recall that the Board conducted a statistical analysis of (1) Step One and Two test-takers who sat for the exam in Nepal or self-identified as a citizen of Nepal, and (2) Step Three test-takers who attended medical school in Nepal or self-identified as a citizen of Nepal.  Jurich Decl. ¶ 18.  As the Court noted in its prior opinion, "[c]onspicuously lacking from these criteria is a limitation to those of Nepali ethnicity or national origin."  <u>Giri I</u>, 718 F. Supp. 3d at 39–40.  And any overlap between people of Nepali citizenship and ethnicity is "insufficient to show that the Board took action on the basis of ethnicity, as distinct from national origin, which [Plaintiffs] must do to make out [their] § 1981 race-discrimination claim."  <u>Id.</u> at 40.

Plaintiffs respond that since they are "natives and citizens of Nepal," their "national origin and ethnicity 'are identical as a factual matter,'" such that they have plausibly alleged discrimination on the basis of ethnicity, as well as national origin.  Opp'n at 31.  But even at this stage of the proceedings, Plaintiffs have not done enough to allege "discrimination [] based on 'ancestry or ethnic characteristics,' not on [their] country of origin."  <u>Ndondji v. InterPark Inc.</u>, 768 F. Supp. 2d 263, 273 (D.D.C. 2011) (citation omitted).  Their factual allegations are entirely "devoted to discriminatory acts based on [their] national origin," <u>id.</u>; specifically, they complain that NBME conducted additional analyses of exams completed by citizens of Nepal.  Jurich Decl. ¶ 11–13.  But they offer no allegations suggesting that any of NBME's actions were taken "based on racial or ethnic characteristics associated with" Nepali national origin.  <u>Amiri v. Hilton Wash. Hotel</u>, 360 F. Supp. 2d 38, 42 (D.D.C. 2003) (citation omitted), <u>aff'd sub nom.</u> <u>Amiri v. Wash. Hilton Hotel</u>, 173 F. App'x 1 (D.C. Cir. 2005).  The complaint includes no allegations specific to Plaintiffs' race or ethnicity and identifies purportedly similarly situated test-takers by

country of origin, not by race, suggesting that Plaintiffs "perceived being ['Nepali'] as referring to [their] national origin and not [their] race." Ndondji, 768 F. Supp. 2d at 273. Plaintiffs' Section 1981 claims thus rest entirely on their Nepali national origin, but "a plaintiff cannot base proof of discrimination under § 1981 *solely* on the place or nation of his origin.'" Kidane v. Nw. Airlines, Inc., 41 F. Supp. 2d 12, 17 (D.D.C. 1999) (emphasis added).

Plaintiffs' claims are therefore substantively identical to numerous Section 1981 claims dismissed by courts in this district. See, e.g., Ndondji, 768 F. Supp. 2d at 273–75 (dismissing Section 1981 claim based solely on plaintiff's Angolan national origin); Kidane, 41 F. Supp. 2d at 16–17 (dismissing Section 1981 claims based solely on the fact that plaintiff was from Ethiopia); Amiri, 360 F. Supp. 2d at 42–43 (dismissing Section 1981 claim "solely based on the fact [plaintiff] is from Afghanistan"); Kalantar v. Lufthansa Ger. Airlines, 402 F. Supp. 2d 130, 138 (D.D.C. 2005) (granting summary judgment to defendant on Section 1981 claim because plaintiff "has not brought forward any evidence that he was singled out [] on the basis of [] 'racial or ethnic characteristics' as opposed to his [Iranian] citizenship"). The Court likewise concludes that Plaintiffs' Section 1981 claims fail on the merits. Indeed, to hold otherwise would permit plaintiffs to proceed further on a claim of "national origin discrimination *per se*," which Section 1981 does not permit. Ndondji, 768 F. Supp. 2d at 273.

**IV.  Conclusion**

For these reasons, the Court will grant Defendant's Motion to Dismiss.  A separate Order

accompanies this Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: January 27, 2025